UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CITY OF SEATTLE, | ) |
| Plaintiff, | ) |
| | ) Case No. |
| vs. | ) |
| | ) COMPLAINT FOR DECLARATORY |
| DONALD J. TRUMP, in his official capacity | ) RELIEF |
| as PRESIDENT OF THE UNITED STATES; | ) |
| JEFFERSON B. SESSIONS, III, in his | ) |
| official capacity as ATTORNEY GENERAL; | ) |
| and JOHN F. KELLY, in his official capacity | ) |
| as SECRETARY OF HOMELAND | ) |
| SECURITY, | ) |
| | ) |
| Defendants. | ) |

## I.   INTRODUCTION

1.      Within days of taking office, President Donald J. Trump promulgated Executive

Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017) (the "Executive Order" or "Order"). This

Order purports to strip virtually all federal funding from cities and other local governments that

refuse to assist the federal government in effectuating its immigration enforcement policies. The

Order is premised on a misreading of federal statutory law and departs dramatically from settled

COMPLAINT FOR DECLARATORY RELIEF - 1

1    constitutional principles. In this suit, the City of Seattle, Washington, seeks a declaration that it is

2    acting consistently with federal law and that the U.S. Constitution precludes application of the

3    Order to deny it federal funds to which it is otherwise entitled.

4        2.    Many municipalities, including Seattle, have decided as a matter of strongly felt

5    local policy that their law enforcement personnel and other employees should not inquire into the

6    immigration status of any person unless specifically required to do so by law or court order. Seattle,

7    like other local governments that have adopted similar "sanctuary" policies, has concluded that a

8    rule precluding inquiry into immigration status furthers public safety and health: such an approach

9    encourages members of immigrant communities both to cooperate with law enforcement personnel

10   in preventing and solving crime, and to seek health assistance when necessary. These policies are

11   overwhelmingly supported by local law enforcement personnel across the nation.

12       3.    The Executive Order avowedly is designed to induce local governments to change

13   these policies, and to force municipalities instead to assist the federal government in enforcing the

14   very different immigration policies of the current federal administration.

15       4.    To accomplish this goal, the Executive Order directs the Secretary of Homeland

16   Security ("the Secretary") to designate so-called "sanctuary jurisdictions," which the Order

17   identifies as those that "willfully refuse to comply with 8 U.S.C. 1373." 82 Fed. Reg. at 8801. That

18   statute provides in relevant part that "a Federal, State, or local government entity or official may

19   not prohibit, or in any way restrict, any government entity or official from sending to, or receiving

20   from, the Immigration and Naturalization Service information regarding the citizenship or

21   immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). The Executive

22   Order then purports to direct the Secretary and the U.S. Attorney General to ensure that these

23   "sanctuary jurisdictions" are denied most federal funds. It also directs the Attorney General to take

COMPLAINT FOR DECLARATORY RELIEF - 2

1   further enforcement action against "any entity" that either violates Section 1373 or "has in effect

2   a statute, policy, or practice that prevents or hinders the enforcement of federal law." 82 Fed. Reg.

3   at 8801.

4   5.     Although Seattle believes that it complies with Section 1373 and all other

5   applicable federal legal requirements, past statements of the President and of other federal

6   Executive Branch officials suggest that Seattle will be treated as a "sanctuary jurisdiction" under

7   the Executive Order. Such a designation would have a devastating effect on Seattle, denying it

8   significant funding that it uses for such essential purposes as home care for the disabled elderly

9   and nutrition assistance for needy children. The prospect of that impact is having an immediate

10  effect on Seattle, as it affects the choices that the City is now making in determining the allocation

11  of funds in its annual budget.

12  6.     The ultimate effect of the Executive Order will be to impose significant penalties

13  on Seattle so long as the City fails to assist the federal government in its immigration enforcement

14  efforts. That outcome is illegal, for several reasons.

15  7.     *First*, Seattle complies with Section 1373. It therefore is not a "sanctuary

16  jurisdiction" as defined by the Executive Order and, for that reason, may not be subjected to the

17  punitive denial of federal funding pursuant to the Order.

18  8.     *Second*, insofar as Section 1373 or other provisions of federal law are thought to

19  require Seattle affirmatively to assist in federal immigration enforcement efforts, the Executive

20  Order is unconstitutional in several respects when it seeks to penalize Seattle for failing to comply

21  with that law:

22  • The Executive Order violates the Tenth Amendment. It is fundamental that the federal

23  government may not direct state and local governments to regulate in a particular way or to enforce

COMPLAINT FOR DECLARATORY RELIEF - 3

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

a federal regulatory program. Yet that is just what the Executive Order does.

- The Executive Order violates the U.S. Constitution's Spending Clause. U.S. Const., Art. I, § 8, cl. 1. It is fundamental that the federal government may neither coerce state or local action through the denial of federal funds, nor seek to affect such action by denying funds that are not germane to the federal program at issue. Yet that is just what the Executive Order does.

- The Executive Order is fatally ambiguous. It is fundamental that state and local governments are not bound by conditions attached to federal grants unless those conditions are clearly stated. Yet the Executive Order is incomprehensibly imprecise in the obligations that it purports to impose on municipalities, as is Section 1373 if that statute is thought to require affirmative acts of immigration enforcement.

9.      Seattle accordingly seeks a declaration that it complies with Section 1373 and that application of the Executive Order to deny it federal funds would violate the U.S. Constitution.

## II.      PARTIES

10.     Plaintiff City of Seattle is a municipal corporation and a city of the first class existing under the laws of the State of Washington.

11.     Defendant Donald J. Trump is the President of the United States of America. He is sued in his official capacity.

12.     Defendant Jefferson B. Sessions, III, is the Attorney General of the United States. Attorney General Sessions is responsible for implementing elements of the Executive Order. He is sued in his official capacity.

13.     Defendant John F. Kelly is the Secretary of the U.S. Department of Homeland Security. Secretary Kelly is responsible for implementing elements of the Executive Oder. He is sued in his official capacity.

COMPLAINT FOR DECLARATORY RELIEF - 4

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

### III.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1346. The Court has further remedial authority pursuant to 28 U.S.C. §§ 2201 and 2202.

15.    Venue in this Court is proper under 28 U.S.C. § 1391(e).

### FACTUAL ASSERTIONS

### IV.    THE CITY OF SEATTLE AND ITS SANCTUARY CITY POLICIES

#### A.    Immigrants Make Essential Contributions to Seattle and Its Economy

16.    The City of Seattle has a population of over 680,000 people, according to the 2016 census. Seattle accounts for over 30% of the total population of King County, Washington, and is located on 143 square miles.

17.    The population of Seattle's metropolitan area, including the Seattle-Tacoma-Bellevue Metropolitan Statistical Area, exceeds 3,700,000. This includes residents from at least 137 foreign countries. More than sixteen percent of these residents are foreign born.

18.    These immigrants make essential contributions to Seattle. Almost twenty percent of Seattle's business owners are immigrants, and more than 39,000 immigrant entrepreneurs have been identified in the City.

19.    Seattle's status as a welcoming and internationally minded city is central to its identity and economy. In 2016, Seattle welcomed approximately 2.7 million foreign visitors. In 2015, the direct spending of foreign visitors in the City is estimated at $1.2 billion. Tourism supports approximately 78,000 jobs in the City, and the tourism sector accounts for almost $700 million in tax revenue.

20.    The Seattle City Council recently, and unanimously, passed Resolution 31730, which states: "Seattle benefits tremendously from the large number of diverse immigrants and

COMPLAINT FOR DECLARATORY RELIEF - 5

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

refugees who contribute to the development of a culturally and economically diverse and enriched community." *Welcoming Cities Resolution*, Seattle City Council, https://goo.gl/IFpFln.

**B.     Seattle Municipal Code Provisions Governing Immigration Status**

21.     Since 1986, the Seattle Municipal Code has provided that "[c]ity officers and employees are directed to cooperate with, and not hinder, enforcement of federal immigration laws." Seattle Mun. Code § 4.18.010.

22.     In 2003, the Seattle City Council unanimously adopted Ordinance 121063.

23.     Ordinance 121063 enacted section 4.18.015 of the Municipal Code, which provides that, notwithstanding Section 4.18.010, and unless otherwise required by law or by court order, "no Seattle City officer or employee shall inquire into the immigration status of any person, or engage in activities designed to ascertain the immigration status of any person." Seattle Mun. Code § 4.18.015(A).

24.     The prohibition in Section 4.18.015(A) does not apply to Seattle police officers when the officer has reason to believe that an individual (1) has previously been deported from the United States; (2) is again present in the United States; and (3) is committing or has committed a felony. Seattle Mun. Code § 4.18.015(B).

25.     Ordinance 121063 recognized that Seattle is home to immigrants from around the world who contribute to the city's cultural richness and economic vitality. Like many other jurisdictions in the United States that have adopted similar provisions, Seattle enacted Ordinance 121063 out of a belief that municipal officers and employees should play a limited role in inquiring into the immigration status of its residents.

26.     Ordinance 121063 also recognized that amending the Municipal Code to bar inquiry into the immigration status of any person is "an effective way to guide city officials and

COMPLAINT FOR DECLARATORY RELIEF - 6

1  employees to adhere to federal law while helping to protect the safety and health of all members

2  of [the] community."

3      27.    Accordingly, although the Municipal Code historically had provided that city

4  officers and employees were to cooperate with federal officials in their enforcement of federal

5  immigration laws, Ordinance 121063 ensured that such cooperation will not harm legitimate public

6  policy goals of the city.

7      28.    In addition, Ordinance 121063 enacted a provision making clear that nothing in

8  Chapter 4 of the Municipal Code "shall be construed to prohibit any Seattle City officer or

9  employee from cooperating with federal immigration authorities as required by law." Seattle Mun.

10  Code § 4.18.035.

11  **C.    Seattle Police Department Practice**

12      29.    Consistent with the Municipal Code, the Seattle Police Department Manual

13  provides that:

> It is the intent of the Seattle Police Department to foster trust and cooperation with all people served by the Department. Complainants, witnesses and victims are encouraged to communicate with Seattle Police officers without fear of inquiry regarding their immigration or alien status. Being an undocumented person in this country, barring any criminal activity, is a federal civil violation not enforced by the Seattle Police Department. In Seattle, only ICE (Immigration and Customs Enforcement) and other federal agencies can enforce federal laws relating to illegal entry and residence within the United States.

> It is the policy of the Department that officers will not request specific documents for the sole purpose of determining someone's immigration or alien status....

> Officers will not initiate police action based solely on an individual's immigration or alien status, nor shall they ask for identification or documents to establish the persons immigration or alien status.

Seattle Police Dep't Manual § 6.020, https://goo.gl/V4e7KX.

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

# V.     SANCTUARY CITY POLICIES BENEFIT CITIES AND THEIR RESIDENTS.

30.     Seattle is not the only municipality to conclude that community involvement and cooperation with police is critical in helping reduce crime, maintain a healthy populace, and safeguard public funds.

31.     Because of variations in how a sanctuary jurisdiction is defined, researchers have identified between 165 and 608 such jurisdictions across the United States. Michelle Ye Hee Lee, *Trump's Claim that Sanctuary Cities "Breed Crime,"* Wash. Post, Feb. 8, 2017.

32.     The Seattle City Council enacted the ordinance described above with the firm conviction that encouraging community members to report crimes and cooperate with police contributes to public safety. Policies restricting local police from inquiring into a person's immigration status foster such cooperation.

33.     In May 2015, the President's Task Force on 21st Century Policing recommended that "[l]aw enforcement agencies should build relationships based on trust with immigrant communities. This is central to overall public safety." The Task Force noted that:

> Immigrants often fear approaching police officers when they are victims of and witnesses to crimes and when local police are entangled with federal immigration enforcement. At all levels of government, it is important that laws, policies, and practices not hinder the ability of local law enforcement to build the strong relationships necessary to public safety and community well-being. It is the view of this task force that whenever possible, state and local law enforcement should not be involved in immigration enforcement.

Final Report of the President's Task Force on 21st Century Policing at 18 (2015), https://goo.gl/acnR68.

34.     Numerous law enforcement organizations have publicly recognized the dangers of commingling local public safety responsibilities with federal immigration enforcement.

COMPLAINT FOR DECLARATORY RELIEF - 8

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

35.     The Major Cities Chiefs Association, a professional association of Chiefs and Sheriffs representing the largest cities in the United States, Canada, and the United Kingdom, has recognized that "[a]ssistance and cooperation from immigrant communities is especially important when an immigrant, whether documented or undocumented, is the victim of or witness to a crime. These persons must be encouraged to file reports and come forward with information. Their cooperation is needed to prevent and solve crimes and maintain public order, safety, and security in the whole community.... Immigration enforcement by local police would likely negatively effect and undermine the level of trust and cooperation between local police and immigrant communities. If the undocumented immigrant's primary concern is that they will be deported or subjected to an immigration status investigation, then they will not come forward and provide needed assistance and cooperation.... Such a divide between the local police and immigrant groups would result in increased crime against immigrants and in the broader community, create a class of silent victims and eliminate the potential for assistance from immigrants in solving crimes or preventing future terroristic acts." M.C.C. Immigration Committee Recommendation for Enforcement of Immigration Laws by Local Police Agencies: Adopted by MCC June 2006, at 5-6, https://goo.gl/SvTaAC.

36.     The Law Enforcement Immigration Task Force, consisting of the Chiefs of Police of two dozen jurisdictions, opposes proposals that impose federal immigration enforcement responsibilities on local law enforcement personnel. Letter from Law Enforcement Immigration Task Force to Senate Judiciary Committee Chairman Chuck Grassley and Ranking Member Patrick J. Leahy (July 20, 2015), https://goo.gl/moXjfV.

37.     The National Fraternal Order of Police and the Major County Sheriffs' Association both oppose withholding federal funds from jurisdictions that adopt "sanctuary city" laws. Letter

COMPLAINT FOR DECLARATORY RELIEF - 9

from National Fraternal Order of Police to Senate Majority Leader Mitch McConnell, Senate Minority Leader Harry M. Reid, Speaker of the House John A. Boehner, and House Minority Leader Nancy P. Pelosi (July 15, 2015), https://goo.gl/WpRJWg; Letter from Major County Sheriffs' Association to Senate Judiciary Committee Chairman Chuck Grassley and Ranking Member Patrick Leahy (July 21, 2015), https://goo.gl/QgSxWS; Major County Sheriffs' Ass'n, *Sheriffs Respond to Sanctuary City Executive Order* (Jan. 28, 2017), https://goo.gl/IF4xZB.

38.     The vast majority of law enforcement agencies do not support policies like those articulated in the Executive Order.

39.     There are approximately 18,000 local law enforcement agencies in the United States. Final Report of the President's Task Force on 21st Century Policing, *supra*, at 29. Yet only thirty-seven law enforcement agencies in sixteen states have signed so-called "287(g) agreements" with U.S. Immigration and Customs Enforcement (ICE) to facilitate enforcement of federal immigration law. Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act, https://goo.gl/HacxLR. Fewer than one percent of all local law enforcement agencies in the country have deemed it advantageous, wise, or desirable to mix their public safety duties with immigration enforcement.

40.     Social science research demonstrates the benefits of "sanctuary city" laws. Using an ICE dataset, Professor Tom K. Wong compared crime, income, poverty, and unemployment across counties based on their willingness to honor ICE detainer requests regarding persons suspected of immigration violations. Professor Wong matched sanctuary counties (unwilling to accept ICE detainers) to comparable nonsanctuary counties (willing to accept ICE detainers). He concluded that "[c]rime is statistically lower in sanctuary counties compared to nonsanctuary counties." Sanctuary jurisdictions experience, "on average, 35.5 fewer crimes committed per

COMPLAINT FOR DECLARATORY RELIEF - 10

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1    10,000 people" as compared to non-sanctuary counties. Tom K. Wong, *The Effects of Sanctuary*

2    *Policies on Crime and the Economy*, Ctr. for Am. Prog. 1 (Jan. 26, 2017), https://goo.gl/ewN3tO.

3        41.     Seattle police officials have not been silent in this national debate. For example,

4    former Chief R. Gil Kerlikowske stated in 2004 that "[t]raditionally we have seen that reporting

5    of crime is much lower in immigrant communities because many are leaving countries where the

6    police cannot be trusted for good reason. Adding the fear of arrest or deportation to this could have

7    a tremendous impact on the rate of reporting." 152 Cong. Rec. 18867 (Sept. 21, 2006). King

8    County, Washington, in which Seattle is located, has had a similar experience with its sanctuary

9    policy. "These policies are critical to public safety," said then-King County Sheriff's spokesman

10   Sgt. John Urquhart, who added that the County policy follows the Sheriff's operations manual.

11   "This policy has worked very well for the Sheriff's Office for 20 years. We could not do our job

12   if people were afraid to come to us as witnesses or victims. We have to have that cooperation to

13   do effective investigations and protect the public." *King County Council Protects Public Safety*

14   *and Health by Ensuring All Residents Have Access to Services,* King Cty. Council News (Nov. 9,

15   2009), https://goo.gl/EW1vFr.

16       42.     In addition to fostering effective policing, there are other significant public policy

17   interests that sanctuary policies advance. For example, such policies eliminate the fear that

18   collection of information about immigration status may discourage undocumented individuals

19   from seeking necessary medical care. This too, has been the experience in King County: Dr. David

20   Fleming, then-Director and Chief Health Officer of Public Health – Seattle & King County,

21   explained that "[t]he preventive care we provide through pre-natal care and immunizations,

22   regardless of immigration status, saves us medical resources and tax dollars in the long term." *Id.*

23

COMPLAINT FOR DECLARATORY RELIEF - 11

## VI.   SEATTLE'S RECEIPT OF FEDERAL FUNDS

43.   The City of Seattle employs over 12,000 people in full-time or part-time positions through the 2017 Adopted Budget. This includes over 2,000 employees of the Police Department, over 1,100 employees of the Fire Department, and over 1,300 employees of Seattle Public Utilities.

44.   For fiscal year 2017, the City has an operating budget with total appropriations of approximately $5.71 billion. Of this total, over $55 million is derived directly from federal funds. This operating total includes $2.46 billion supporting the City's utility operations. The City's total appropriations in its non-utility operating budget is $3.25 billion, of which approximately $51 million in 2017 is derived from federal funds. This amount omits additional federal contributions that are not used in the City's operating budget, but instead fund multi-year capital expenditures. The federal government is contributing over $99 million in such capital funds to Seattle in 2017 alone. Between both capital and operating funds, the City will receive over $155 million from the federal government in 2017.

45.   Much of the City's federal funding is provided on a reimbursable basis. This means that Seattle expends funds to provide programs and services that the federal government has agreed to reimburse. Seattle is currently engaged in substantial capital projects, including those for public infrastructure, and also is running a variety of essential programs for residents, based on the federal government's commitment to reimburse the City for these costs. The Executive Order raises significant doubts about whether the federal government will, in fact, reimburse Seattle for the substantial sums it is expending every day on federally funded programs.

### A.   Human Services Department

46.   The Seattle Human Services Department (HSD) is responsible for administering approximately 400 contracts with more than 170 community-based providers that offer services to

COMPLAINT FOR DECLARATORY RELIEF - 12

the City's most vulnerable residents and communities every year. These programs ensure that all Seattle residents have access to adequate food and shelter, educational and professional opportunities, health care, pathways to social and economic independence, and the basic necessities of life. *Human Services*, City of Seattle, https://goo.gl/fVBPYz.

47.     HSD pursues vital objectives including: "ending homelessness, hunger and violence in [the] community and improving the health and well-being of everyone who calls the Seattle area home." *Human Services – About Us*, City of Seattle, https://goo.gl/uyYHiH. Specific initiatives include programs such as: "Addressing Homelessness, Affordability and Livability, Public Health, Preparing Youth for the Future, Addressing Domestic Violence and Sexual Assault, [and] Promoting Healthy Aging." *Id.*

48.     To further these missions, HSD employs over 300 individuals in part-time or full-time positions. In 2017, almost 100 individuals employed by HSD are supported by federal grants.

49.     In 2017, HSD has an Adopted Budget of approximately $150 million. Of this amount, over $42 million or 28% is derived from federal funding sources.

50.     Federal funds are essential to numerous HSD initiatives that serve Seattle residents. For example, the federal government provides over $11 million to the city to support home-based care for elderly residents with disabilities, allowing them to remain in their own homes. This contribution represents almost 50% of the budget for such services. Federal funds also provide support for a continuum of services for homeless residents, including prevention activities, housing services, and survival interventions that provide shelter, outreach, hygiene, and health care. The $15 million provided by the federal government represents 28% of the budget for such activities of the Homeless Strategy and Investment Division. The federal government provides an addition $4 million through a Community Development Block Grant to fund a Homeless Intervention

COMPLAINT FOR DECLARATORY RELIEF - 13

program that provides emergency shelter and transitional housing for homeless single men, women, and families, hygiene services, housing counseling, and rent assistance. Federal funds totaling over $1 million also account for over 20% of the budget for a nutrition assistance program that provides both high-quality food and nutritional education to children and families.

51.     The reach of federal funding into the social services provided by the City of Seattle is expansive. In addition to the above examples, funds that support low-income housing, meals for children in child-care homes and at school, college readiness programs for low-income, first generation teenagers, youth violence prevention programs, and Medicaid all derive from the federal government.

52.     The loss of the federal funds supporting these programs would harm all Seattle residents. Without this funding, many programs will be diminished, less effective, or cease functioning entirely.

**B.      Seattle Police Department**

53.     The Seattle Police Department (SPD) is responsible for "prevent[ing] crime, enforc[ing] the law, and support[ing] quality public safety by delivering respectful, professional and dependable police services." Seattle Police Department Manual, Mission Statement, https://goo.gl/oeAFiw.

54.     To accomplish this mission, SPD had over 1,400 sworn police officers in 2016 and has a 2017 budget totaling over $320 million. *See Department Overview*, Seattle Police Dep't, https://goo.gl/La3b3S; *Seattle Police Department*, Open Budget, https://goo.gl/kSWIef. This represents approximately 10% of the city's annual non-utility operating budget.

55.     The Department is scheduled to receive over $2.8 million in federal funds in 2017, part of over $10.5 million in federal funds allocated over a multi-year period. The impact of the

COMPLAINT FOR DECLARATORY RELIEF - 14

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

2017 annual federal award amount is augmented by a matching commitment from the city totaling $2.6 million.

56.     Federal grants support numerous public safety initiatives and programs that are essential to public safety. Such funds enable SPD to purchase emergency response equipment such as bomb suits, investigate human trafficking, reduce drunk and distracted driving, achieve department-wide deployment of body cameras, secure port facilities, prevent child sexual exploitation over the Internet, combat terrorism, and build ties with local communities through community policing efforts, among many other activities.

57.     The impact of losing all federal funding would be substantial. The Department would need either to find alternative funds or forgo purchasing vital equipment, dismiss staff responsible for critical public safety functions, or shut down entire programs.

**C.    Seattle Department of Transportation**

58.     "The Seattle Department of Transportation (SDOT) develops, maintains, and operates a transportation system that promotes the safe and efficient mobility of people and goods, and enhances the quality of life, environment, and economy of Seattle and the surrounding region." *SDOT Budgets*, Seattle Dep't of Transp., https://goo.gl/ck5QL6.

59.     SDOT manages an infrastructure that is valued at over $20 billion and includes: "1,547 lane-miles of arterial streets, 2,407 lane-miles of nonarterial streets, 118 bridges, 498 stairways, 590 retaining walls, [and] 22 miles of seawalls." *Id.*

60.     To accomplish this task, SDOT employs over 900 individuals in full-time or part-time positions and has a 2017 operating budget of over $448 million. *Seattle Department of Transportation*, Open Budget, https://goo.gl/mkkrjF.

COMPLAINT FOR DECLARATORY RELIEF - 15

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

61.     The federal government is set to contribute over $63 million to capital expenditures supporting multi-year projects in 2017 alone. Across multiple time periods, the federal government is contributing over $250 million to capital expenditures undertaken by SDOT.

62.     Federal funds directly support numerous SDOT activities that keep Seattle residents both mobile and safe. These include preventative and significant maintenance, replacing bridges, undertaking seismic retrofitting to protect against earthquakes, bike path and pedestrian area improvements, and even purchasing streetcars.

63.     Without the allotted federal funds, projects will be delayed or cancelled, maintenance will be deferred, and other city resources would need to be repurposed to satisfy vital transportation needs.

## VII.     18 U.S.C. § 1373

64.     Section 1373(a) of Title 8 of the U.S. Code provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." By its plain terms, this statute does not require the collection by state or local officials of information regarding citizenship or immigration status, but does purport to bar policies that preclude local entities or individuals from sending such information in their possession to federal officials.

65.     On May 31, 2016, the Inspector General of the U.S. Department of Justice issued a memorandum stating that policies prohibiting local officials from sharing information with the federal government are "inconsistent with the plain language of Section 1373." Memorandum from Michael E. Horowitz, Inspector General, to Karol V. Mason, Ass't Att'y Gen., Office of Justice

COMPLAINT FOR DECLARATORY RELIEF - 16

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1   Programs (May 31, 2016), at 5, https://goo.gl/7bhFHd. At the same time, however, the Inspector

2   General confirmed that Section 1373 "does not 'require' the disclosure of immigration status

3   information." *Id.* at 5 n.7. It also does not expressly mandate other forms of cooperation, such as

4   "cooperation with ICE regarding detainers." *Id.* at 4.

5       66.     But the Inspector General also concluded that even policies that do not "explicitly

6   proscribe sharing information with ICE" might be construed to violate Section 1373 to the extent

7   they can be read by local officials as prohibiting such communications. *Id.* at 7. Likewise, he

8   determined that Section 1373 would be violated where "actions of local officials result in

9   prohibitions or restrictions" on information-sharing, even where the local jurisdiction has no

10  express policy against information-sharing. *Id.* at 7 n.9.

11      67.     On July 7, 2016, the U.S. Department of Justice Office of Justice Programs issued

12  guidance concerning federal grants and compliance with Section 1373. Office of Justice Programs,

13  *Guidance Regarding Compliance with 8 U.S.C. § 1373* (July 7, 2016), https://goo.gl/YPD1Li.

14      68.     The guidance explained that Section 1373 does not require localities "to collect

15  information," nor to "take specific actions upon obtaining such information." *Id.* at 1. But Section

16  1373, as interpreted in the guidance, does prohibit localities from "taking action to prohibit or in

17  any way restrict the maintenance or intergovernmental exchange of such information, including

18  through written or unwritten policies or practices." *Id.*

19      69.     The guidance further instructed localities that "[y]our personnel must be informed

20  that … federal law does not allow any government entity or official to prohibit the sending or

21  receiving of information about an individual's citizenship or immigration status" (*id.*)—*i.e.*, it

22  declares that localities must affirmatively tell their employees that they have the right to relay

23

COMPLAINT FOR DECLARATORY RELIEF - 17

information to the federal government, even though no such requirement is stated in the text of Section 1373.

70.     By its terms, however, Section 1373(a) does not establish any penalties or other legal consequences for a local government's decision to prohibit its employees from sharing immigration information with the federal government. Nor does any other provision of federal law. *See Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 573 (5th Cir. 2013) ("Congress passed no law concerning … 'sanctuary cities.'").

## VIII.   THE EXECUTIVE ORDER

71.     On January 25, 2017, Defendant Trump signed Executive Order No. 13768, titled "Enhancing Public Safety in the Interior of the United States." Executive Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017).

72.     The Executive Order is directed at "[s]anctuary jurisdictions across the United States [that] willfully violate Federal law in an attempt to shield aliens from removal from the United States." *Id.* § 1. The Order asserts that "[t]hese jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic" (*id.*), although it recites no factual support for this proposition and disregards the contrary conclusions of the state and local jurisdictions that have primary responsibility for law enforcement and public safety in the United States.

73.     The Executive Order states that it is the policy of the federal Executive Branch to "[e]nsure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." *Id.* § 2(c).

COMPLAINT FOR DECLARATORY RELIEF - 18

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

74. To that end, the Executive Order "direct[s] [federal] agencies to employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all removable aliens." *Id.* § 4.

75. In particular, Section 9 of the Executive Order states that "[i]t is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. § 1373."

76. In furtherance of this policy, the Executive Order provides that the Attorney General and Secretary "shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary." *Id.* § 9(a). For this purpose, the Secretary is given the unreviewable "authority to designate … a jurisdiction as a sanctuary jurisdiction." *Id.*

77. In addition, the Executive Order provides that the Attorney General "shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of federal law." *Id.*

78. It appears that the Executive Order contemplates withholding *all* federal funds from these "sanctuary jurisdictions," with the exception of unspecified funds "deemed necessary for law enforcement purposes." This seems to be the import of the blanket directive that the Attorney General and Secretary "ensure" that sanctuary jurisdictions "are not eligible to receive Federal grants." The expansive scope of the Order's limitation on federal funding is confirmed by the Executive Order's directive that the Director of the federal Office of Management and Budget "obtain and provide relevant and responsive information on all federal grant money that currently is received by any sanctuary jurisdiction." *Id.* §9(c).

COMPLAINT FOR DECLARATORY RELIEF - 19

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

79. Although written in broad terms, the Executive Order's particular import is unclear in significant respects because the Order does not define any of its terms.

80. Thus, although the Executive Order, through use of a parenthetical, evidently means to define "sanctuary jurisdiction[s]" as those that "willfully refuse to comply with 8 U.S.C. 1373," the Order does not define what constitutes a "willful[] refus[al] to comply with 8 U.S.C. § 1373," and therefore may encompass jurisdictions that permit their employees to share immigration information with the federal government but prohibit their employees from collecting or maintaining that information in the first place.

81. The terms "sanctuary jurisdiction" and "sanctuary city" are not defined, or otherwise used, in any other provision of federal law. *See United States v. Juarez-Escobar*, 25 F. Supp. 3d 774, 777 (W.D. Pa. 2014) ("There is very little 'official' information concerning 'sanctuary cities' or 'sanctuary states.'"); *Unidad Latina en Accion v. U.S. Dep't of Justice*, 2010 WL 7856573, at *1 n.2 (D. Conn. 2010) (referring to "sanctuary city" as a "non-legal term").

82. Indeed, when asked to define the term "sanctuary city," Defendant Kelly—the official charged by the Executive Order with determining whether a city *is* a "sanctuary jurisdiction"—responded: "I don't have a clue." Elliot Spagat, Assoc. Press, *Homeland Security Head Is Pressed to Define "Sanctuary City,"* Feb. 11, 2017, https://goo.gl/5rkNCQ.

83. Similarly, the Executive Order does not specify what sorts of grants serve "law enforcement purposes" that are exempt from the Order's ban on federal funding, or when the Attorney General or Secretary permissibly may withhold funds serving such "law enforcement" purposes.

84. In addition, the Executive Order directs the Attorney General to "take appropriate enforcement action against any entity that violates 8 U.S.C. § 1373, or which has in effect a statute,

COMPLAINT FOR DECLARATORY RELIEF - 20

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1    policy, or practice that prevents or hinders the enforcement of Federal law." Executive Order, §

2    9(a). But the Order does not identify the type of "enforcement action" that the Attorney General

3    may take against such entities, including whether the Attorney General's enforcement power is

4    limited to declaring sanctuary jurisdictions ineligible to receive federal grants. The Order also does

5    not define what it means for an entity to "prevent[] or hinder[] the enforcement of Federal law,"

6    an omission that creates particular uncertainty because, by its terms, Section 9(a) applies to *any*

7    provision of Federal law, not simply 8 U.S.C. § 1373 or other provisions of federal *immigration*

8    law.

### IX.    DEFENDANTS HAVE THREATENED SEATTLE WITH THE LOSS OF FEDERAL FUNDS

85.    Defendants have made statements indicating that they intend to take punitive actions against Seattle because they regard the City to be a "sanctuary jurisdiction."

86.    During his presidential campaign, Defendant Trump repeatedly "said he … would withhold federal funds to punish so-called sanctuary cities … for their lenient policies toward illegal immigration." Cindy Carcamo et al., *Trump's Crackdown on Illegal Immigration Leaves A Lot Unanswered for Sanctuary Cities like L.A.*, L.A. Times, Nov. 15, 2016, https://goo.gl/FqFuf4.

87.    Among other statements, in a speech on immigration on August 31, 2016, Defendant Trump claimed that "[c]ountless innocent American lives" have been lost because of "sanctuary cities and open borders." Donald J. Trump, Speech on Immigration in Phoenix, Ariz. (Aug. 31, 2016), https://goo.gl/Rx1Pks. He declared that he would "block funding for sanctuary cities," "end the sanctuary cities that have resulted in so many needless deaths," and ensure that "[c]ities that refuse to cooperate with federal authorities will not receive taxpayer dollars." *Id.*

COMPLAINT FOR DECLARATORY RELIEF - 21

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

88.     Defendant Trump referred to Seattle in particular as a "sanctuary city" that would be a target of his administration. For instance, "[o]n the campaign trail, [Defendant] Trump referenced a 2007 Seattle homicide in his dislike for sanctuary cities." *Mayor: Seattle Could Lose $85 Million by Remaining a Sanctuary City*, KIRO7 (Jan. 25, 2017, 9:09 PM), https://goo.gl/euC8TN.

89.     In an interview with a Seattle radio station on August 29, 2016, Defendant Trump was asked about Seattle's sanctuary city policy. He responded that "sanctuary cities are out … sanctuary cities are over." He added that "[t]he federal government is going to have to get involved and they're going to have to get involved very sharply." *Donald Trump on Colin Kaepernick: He Should Find Another Country*, MYNorthwest (Aug. 29, 2016, 5:03 PM), https://goo.gl/JidxYJ.

90.     In a speech in Everett, Washington, on August 30, 2016, Defendant Trump stated that "[w]e are also going to secure our border to stop the drugs from pouring in," and specifically referenced the Seattle area. *Trump: Party of Lincoln Promises Hope to Every Forgotten Stretch of America* (Aug. 30, 2016), https://goo.gl/Cn84rQ.

91.     Defendant Trump has continued to attack sanctuary cities since his inauguration. In a speech to congressional Republicans, Defendant Trump declared: "And finally, at long last, cracking down on Sanctuary Cities." *President Trump Remarks at Congressional Republican Retreat*, C-Span (Jan 26, 2017), https://goo.gl/7Gya30.

92.     In an interview with Fox News host Bill O'Reilly, Defendant Trump reiterated that he is "very much opposed to sanctuary cities," and that "[i]f we have to, we'll defund." *Trump: California 'Out of Control' and Defunding Could Be In Store*, KQED News (Feb. 6, 2017), https://goo.gl/TgLAkL.

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

93.     In a news conference on February 16, Defendant Trump explained that he had "ordered a crackdown on sanctuary cities." Glenn Kessler & Michelle Ye Hee Lee, *Fact-Checking President Trump's News Conference*, Wash. Post., Feb. 16, 2017, https://goo.gl/tT4oWx.

94.     In a tweet sent on February 21, Defendant Trump referenced a poll on Americans' attitudes toward sanctuary cities, presumably in support of his executive order. *See* Teresa Welch, *Today in Trump Tweets, Feb. 21, 2017: Sanctuary Cities and "So-Called Angry Crowds,"* McClatchy DC Bureau, Feb. 21, 2017, https://goo.gl/lQtn1R.

95.     Similarly, Defendant Trump's press secretary, Sean Spicer, has insisted that "the President is going to do everything he can within the scope of the executive order to make sure that cities who don't comply with it—counties and other institutions that remain sanctuary cities don't get federal government funding in compliance with the executive order." *Press Briefing by Press Secretary Sean Spicer* (Feb. 8, 2017), https://goo.gl/yru1yo; *see also* Priscilla Alvarez, *Trump Cracks Down on Sanctuary Cities*, The Atlantic (Jan. 25, 2017), https://goo.gl/pKHmJD (quoting Sean Spicer as saying "We're going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants. The American people are no longer going to have to be forced to subsidize this disregard for our laws.").

96.     Other defendants have likewise referred to the need to take action against sanctuary cities, including by stripping them of their federal funding. In a speech to Congress on July 9, 2015, Defendant Sessions called on Congress "to make its first item of business the immediate passage of legislation to cut off relevant federal monies to sanctuary cities." *Senator Sessions Calls on Congress to Take Up Immigration Reform for Americans* (July 9, 2015), https://goo.gl/115ov7. Indeed, at the ceremony where he was sworn in as Attorney General, Defendant Sessions emphasized that the Department of Justice would "end th[e] lawlessness" of illegal immigration

COMPLAINT FOR DECLARATORY RELIEF - 23

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

and "defend the lawful orders of the President of the United States with vigor and determination." *President Trump Participates in the Swearing-In of the Attorney General, Jeff Sessions*, YouTube, https://goo.gl/GTK15I (last visited Feb. 9, 2017, 12:02 PM).

97. More recently, Defendant Sessions appeared at the White House Press Briefing to declare that "the Department of Justice will require that jurisdictions seeking or applying for Department of Justice grants to certify compliance with 1373 as a condition of receiving those awards." Press Briefing By Press Secretary Sean Spicer (Mar. 27, 2017), https://goo.gl/Sfd49z. He likewise threatened that "[t]he Department of Justice will also take all lawful steps to claw back any funds awarded to a jurisdiction that willfully violates 1373." *Id.* In response to a question about whether other funds might be taken away from sanctuary cities, Defendant Sessions stated that "grants in the future could be issued that have additional requirements." *Id.*

98. Defendants appear to have begun taking action against cities that refuse to comply with their dictates. Defendant Trump's recent budget proposal "was an opening salvo against so-called sanctuary cities, ... slash[ing] $210 million in federal reimbursements to state and local jails that hold immigrants convicted of crimes while in the country illegally." Brian Bennett, *Trump Takes Aim at "Sanctuary Cities" with a Proposal to Cut More than $200 Million in Local Funds*, L.A. Times, Mar. 16, 2017, https://goo.gl/sukI6E. And a federal judge recently stated that he had been warned by federal agents "to expect a crackdown on immigrants in response to a new 'sanctuary' policy adopted by Travis County," Texas. *Federal Judge Says ICE Targeted Austin for Immigrant Raid in Retaliation for "Sanctuary" Policy*, The Week, Mar. 21, 2017, https://goo.gl/UPvIO1.

99. Federal government agencies have also long designated Seattle and other localities in the State of Washington as jurisdictions that fail to comply with federal requests for assistance

COMPLAINT FOR DECLARATORY RELIEF - 24

in enforcing the immigration laws. A 2014 report from the Department of Homeland Security listed Seattle and other municipalities in Washington as refusing to comply with ICE detainer requests. Dep't of Homeland Security, *Declined Detainer Outcome Report* 23-25 (Oct. 8, 2014), https://goo.gl/FvCIFW. A 2006 report from the Congressional Research Service identified Seattle as a jurisdiction with a "sanctuary polic[y]." Lisa M. Seghetti et al., *Enforcing Immigration Law: The Role of State and Local Law Enforcement*, Cong. Res. Serv. 26 n.8 (Aug. 14, 2006), https://goo.gl/mY7W5K.

100. Indeed, the Department of Homeland Security recently released "its first report listing jurisdictions that refuse cooperation with federal immigration authorities—a step designed to put public pressure on sanctuary cities." Rafael Bernal & Mike Lillis, *Trump Moves Sanctuary City Fight to Front Burner*, The Hill, Mar. 22, 2017, https://goo.gl/fjkNvl. That report lists several counties associated with the Seattle metropolitan area. *See Enforcement and Removal Operations: Weekly Declined Detainer Report*, U.S. Immig. & Customs Enforcement 29-31, https://goo.gl/1DCsWd.

101. Thus, "Seattle will almost certainly be on [the Attorney General's] list" for punitive action, given that Seattle has "prohibited city employees, including police, from inquiring about someone's immigration status" since 2003, and that Seattle has "roundly condemned the executive order" issued by Defendant Trump. Casey Jaywork, *Trump Orders Funding Cuts to Sanctuary Cities, Promising a Showdown with Seattle*, Seattle Weekly (Jan. 25, 2017, 1:35 PM), https://goo.gl/ELGxaq; *see also* David Kroman, *As Trump Targets 'Sanctuary Cities,' Seattle Plans Budget Cuts*, Crosscut (Jan. 25, 2017), https://goo.gl/SrxvzO ("Seattle is a prime target.").

COMPLAINT FOR DECLARATORY RELIEF - 25

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

## X. THE EXECUTIVE ORDER IS CAUSING IMMEDIATE HARM TO SEATTLE

102. The imminent threat that the Executive Order poses to Seattle's federal funding is having a current impact on the City's budget process and operations.

103. Seattle's fiscal year for 2017 began on January 1, and the budget process for 2018 is already underway. On March 10, the Mayor and the City Budget Office sent instructions and guidance to city departments about the upcoming budget process. Those same departments must submit budget memoranda for review and guidance by April 5. The multi-step budget process will continue throughout spring and summer, with each step of the process dependent on the materials and plans prepared at the prior steps.

104. After receiving departments' budget memoranda, on May 1 the Mayor and the budget office provide guidance for departments to complete their budget submittals, which are due on June 1, with remaining capital budget work due to the budget office by July 1. Additional work in July and August leads to the delivery of a proposed budget to the City Council by September 25, with Council action expected on November 20.

105. The Executive Order creates irresolvable uncertainty surrounding whether federal funds that currently benefit all Seattle residents will be cut off if the city is deemed a "sanctuary jurisdiction."

106. Such uncertainty has a substantial and immediate impact on the City's budget process, as each of the steps described above is dependent on accurate forecasting of available sources of funds. Should federal funding be cut off, the entire budget process would be thrown into disarray given the city's reliance on over $50 million in federal funds for its operating budget and millions more to help fund capital projects.

COMPLAINT FOR DECLARATORY RELIEF - 26

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

## XI.   THE EXECUTIVE ORDER IS UNCONSTITUTIONAL

107.   The Executive Order has several characteristics that render it unconstitutional as a general matter and that make its application to Seattle constitutionally impermissible.

108.   *First*, given the breadth of the Executive Order's reading of Section 1373 and the expansive terms of the Order, it appears that the Order is designed to punish municipalities like Seattle for not actively assisting the federal government in its enforcement of the immigration laws—and, by doing so, to coerce those municipalities into providing such assistance. This attempt to compel a state or local government to assist in the enforcement of federal law is precluded by the "anti-commandeering principle" of the Tenth Amendment.

109.   Forbidden "commandeering" occurs when the federal government "require[s] the States in their sovereign capacity to regulate their own citizens." *Reno v. Condon*, 528 U.S. 141, 151 (2000). The Supreme Court has made clear that, under the Tenth Amendment, "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).

110.   The Executive Order issues just such commands to "sanctuary jurisdictions." It demands compliance with Section 1373, a statute that directs local governments to permit their employees to communicate with the federal government regarding the immigration status of their residents, and thereby interferes with how those governments direct and control the actions of their employees and officials. *Cf., e.g., Nevada v. Hicks*, 533 U.S. 353, 365 (2001) ("[A] State can act only through its officers and agents."); *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign."). Federal authorities, moreover, have given Section 1373 an

COMPLAINT FOR DECLARATORY RELIEF - 27

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

even broader reading. Seattle maintains that it complies with Section 1373. But wholly apart from whether Section 1373 is itself constitutional and enforceable, the Executive Order, by imposing draconian punishments on noncompliance with that statute in an effort to force state and local officials to assist in federal law enforcement, plainly is not.

111.    Under Section 1373(a), local governments may not prevent employees from sharing information, even though that "information ... belongs to the State and is available to the[] [employees] only in their official capacity," including via "databases and records that only state officials have access too." *Printz*, 521 U.S. at 932 n.17.

112.    Section 1373(a) sweeps broadly to "any government entity or official," and so covers local employees who perform a number of core functions with respect to local governance.

113.    For example, many of the employees covered by Section 1373(a) are police officers, who "fulfill[] a most fundamental obligation of government to its constituency" and "affect[] members of the public significantly and often in the most sensitive areas of daily life." *Foley v. Connelie*, 435 U.S. 291, 297 (1978). Under Section 1373(a), local governments must permit police officers who come across immigration information in the course of their duties to relay such information to the federal government.

114.    Moreover, it appears that the Executive Order purports to impose obligations upon state and local governments that go well beyond those stated in the plain terms of Section 1373. Even prior to issuance of the Executive Order, the federal Executive Branch read duties into the statute that do not appear in its text, including the requirement that state and local employees be instructed on their entitlement to direct immigration information to federal authorities. And the Executive Order goes further yet, providing in Section 9(a) that the Attorney General "shall" take action against any entity that "has in effect a statute, policy, or practice that prevents or hinders

COMPLAINT FOR DECLARATORY RELIEF - 28

the enforcement of Federal law." Because a policy that fails to provide affirmative support for the enforcement of federal immigration law could well be said to "hinder the enforcement" of that law, this requirement of the Executive Order appears to impose extensive affirmative obligations on state and local officials.

115.     By punishing noncompliance with Section 1373(a) and other elements of federal law, the Executive Order forces local governments to allow their employees to eschew their essential duties in favor of carrying out the policies of the federal government. Under this regime, "[t]he power of the Federal Government" is "augmented immeasurably" because it can "impress into its service—and at no cost to itself—the police officers of the 50 States," as well as other State and local officials, for the purpose of enforcing the federal immigration laws. *Printz*, 521 U.S. at 922.

116.     By forcing localities to "absorb the financial burden of implementing" federal immigration law through the Executive Order's effectuation of Section 1373(a), the President and "Members of Congress can take credit for 'solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes." *Printz*, 521 U.S. at 930.

117.     The Executive Order also leaves local governments "in the position of taking the blame" (*Printz*, 521 U.S. at 930) for any action the federal government takes based on information provided by local officials, including deportations of local residents and immigration enforcement raids. Local governments will likewise be blamed for failing to provide social services to local residents who fear that contacting municipal officials will expose them to immigration authorities. Under the Tenth Amendment, the federal government may not impose such burdens on state and local authorities.

COMPLAINT FOR DECLARATORY RELIEF - 29

118. In this regard, it is irrelevant that the Executive Order and Section 1373 are premised on the federal government's power over immigration. "No matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require the States to regulate." *New York v. United States*, 505 U.S. 144, 178 (1992).

119. **Second**, and separately, the Executive Order violates the restrictions on federal authority imposed by the U.S. Constitution's Spending Clause.

120. When conditions on the payment to state or local governments of specific federal funds "take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2604 (2012). Here, the Executive Order's funding termination requirement, which threatens to terminate virtually *all* federal funding for "sanctuary jurisdictions," is specifically imposed for just that purpose. And in doing so, it imposes a condition so severe that it "crosse[s] the line distinguishing encouragement from coercion." *Id.* at 2603. Given the centrality of federal funding to the day-to-day functioning of virtually all municipalities, including Seattle, such a condition "is much more than 'relatively mild encouragement'—it is a gun to the head." *Id.* at 2604. A threat of this sort constitutes "economic dragooning that leaves the States with no real option but to acquiesce" to the federal requirement. *Id.* at 2605.

121. Even setting aside the coerciveness of its threat to strip "sanctuary jurisdictions" of all federal grants, the Executive Order also purports to strip federal funding from local governments even when that funding is unrelated to federal immigration law. The Executive Order therefore violates the Spending Clause requirement that conditions on federal grants to state and local governments must be "[]related 'to the federal interest in particular national projects or

COMPLAINT FOR DECLARATORY RELIEF - 30

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

programs'" that are the subject of the withheld grant. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

122.     ***Third***, likely because the Executive Order was drafted in extraordinary haste and, most unusually, without any involvement by the responsible Cabinet departments, the Order is fatally ambiguous. It uses terms that are vague and not defined, does not spell out the particular enforcement objectives of the Secretary and Attorney General, and does not describe in an intelligible manner the federal Executive Branch's understanding of the requirements purportedly imposed by Section 1373. The Executive Order therefore does not inform municipalities like Seattle of the consequences if they engage in given "sanctuary" policies.

123.     The Spending Clause precludes the enforcement of funding conditions of this sort. It is settled that, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981); *see Dole*, 483 U.S. at 207. This is because "[t]he legitimacy of Congress' power to legislate under the spending power ... rests on whether the State voluntarily and knowingly accepts" the federal conditions. *Pennhurst*, 451 U.S. at 17. "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.*

124.     Here, neither the plain terms of Section 1373 itself, nor the additional requirements stated by the Executive Order, adequately informed Seattle at the time it engaged in the relevant conduct of the new and greatly expanded conditions that the Executive Order now purports to impose on the receipt of federal funds. Such conditions may not constitutionally be enforced.

COMPLAINT FOR DECLARATORY RELIEF - 31

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

## CAUSES OF ACTION

## XII.    COUNT ONE

### Declaratory Judgment That Seattle Complies With 8 U.S.C. § 1373

125.    Seattle repeats and incorporates by reference each allegation that appears in Paragraphs 1-124 above.

126.    Seattle alleges that it complies with Section 1373 because that statute does not impose an affirmative obligation to collect the citizenship and immigration data of its residents, or to provide such data to federal officials.

127.    Defendants contend that Seattle does not comply with Section 1373.

128.    An actual controversy exists between Plaintiff and Defendants about the scope of Section 1373 and Plaintiff's compliance with that statute.

129.    A judicial determination resolving this controversy is necessary and appropriate at this time.

## XIII.    COUNT TWO

### The Executive Order Violates The Tenth Amendment's Anti-Commandeering Rule

130.    Seattle repeats and incorporates by reference each allegation that appears in Paragraphs 1-129 above.

131.    To the extent that the Executive Order imposes affirmative duties on state and local officials beyond those prescribed in Section 1373, or to the extent that Section 1373 is thought to impose such affirmative duties and the Executive Order penalizes Seattle for failing to perform those duties, the Order is unconstitutional under the Tenth Amendment's anti-commandeering principle. The Supreme Court has made clear that "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or

COMPLAINT FOR DECLARATORY RELIEF - 32

those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935. On its face and as applied, the Executive Order does just that.

## XIV.   COUNT THREE

### The Executive Order Violates The Spending Clause

132.    Seattle repeats and incorporates by reference each allegation that appears in Paragraphs 1-131 above.

133.    The Executive Order purports to deny "sanctuary jurisdictions" *all* federal grants. Such an extreme penalty as a consequence of the "sanctuary jurisdiction" designation is unconstitutionally coercive under *Sebelius*, 132 S. Ct. at 2604.

134.    Even setting aside the coerciveness of its threat to strip sanctuary cities of all federal grants, the Executive Order is unconstitutional under the Spending Clause for placing conditions on the receipt of federal funds that are not "[]related to the federal interest in particular national projects or programs" paid for by those funds. *South Dakota v. Dole*, 483 U.S. at 207.

135.    Moreover, neither Section 1373 nor the Executive Order provides adequately unambiguous notice to municipalities of the conditions that the federal Executive Branch now would attach to the receipt of federal funds. Such conditions may not constitutionally be enforced.

## XV.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

1.    Declare that Seattle is in compliance with 8 U.S.C. § 1373;

2.    Declare that Seattle is not a "sanctuary jurisdiction" as defined in the Executive Order;

3.    Declare that Section 9 of the Executive Order is unconstitutional on its face and as applied to Seattle, under the Tenth Amendment and the Spending Clause of the United States

COMPLAINT FOR DECLARATORY RELIEF - 33

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Constitution;

4.      Award Seattle its costs in this action, including its reasonable attorneys' fees incurred; and

5.      Award such other relief as the Court deems just and proper.

DATED this 29ᵗʰ day of March, 2017.

PETER S. HOLMES
Seattle City Attorney

By:     _____

Peter S. Holmes, WSBA #15787
Seattle City Attorney
Gregory C. Narver, WSBA #18127
Assistant City Attorney
Carlton W.M. Seu, WSBA #26830
Assistant City Attorney
Michael K. Ryan, WSBA #32091
Assistant City Attorney
Gary T. Smith, WSBA #29718
Assistant City Attorney

Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
Phone: (206) 684-8207
Fax: (206) 684-8284

Andrew J. Pincus (*pro has vice* motion to be filed)
Charles A. Rothfeld (*pro hac vice* motion to be filed)
Ori Lev (*pro had vice* motion to be filed)
Travis Crum (*pro hac vice* motion to be filed)
John T. Lewis (*pro hac vice* motion to be filed)
Joshua M. Silverstein (*pro hac vice* motion to be filed)
Karianne M. Jones (*pro hac vice* motion to be filed)
MAYER BROWN LLP
1999 K Street, NW
Washington, D.C. 20006
Phone: (202) 263-3000
Fax: (202) 263-3300

Attorneys for Plaintiff

COMPLAINT FOR DECLARATORY RELIEF - 34