UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF SEATTLE, *et al.*,

    Plaintiffs,

v.

DONALD J. TRUMP, *et al.*

    Defendants.

Case No. 17-497-RAJ

ORDER

This matter comes before the Court on Defendants Donald J. Trump, Jefferson B. Sessions, III, and John F. Kelly's (the "Government") Motion to Dismiss the First Amended Complaint. Dkt. # 34. This motion is nearly identical to one the Government filed in *County of Santa Clara v. Trump, et al.*, No. 3:17-cv-00574-WHO (N.D. Cal. filed Feb. 3, 2017). With this in mind, and having reviewed the parties' briefs and balance of the record, the Court finds oral argument unnecessary. For the reasons that follow, the Court **DENIES** the Government's motion.

## I. BACKGROUND

### A. The Executive Order

On January 25, 2017, President Donald J. Trump issued Executive Order No. 13768, "Enhancing Public Safety in the Interior of the United States." 82 Fed. Reg. 8799 (Jan. 25, 2017) ("Executive Order" or "EO"). The Executive Order announced policies and priorities concerning the enforcement of federal immigration laws. Section 9(a) of the Executive Order regards the eligibility of "sanctuary jurisdictions" to receive federal

ORDER – 1

funding. Specifically, section 9(a) provides:

> In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

EO § 9(a). The Executive Order does not define "sanctuary jurisdiction" and does not expand upon what constitutes "willfully refus[ing] to comply with" Section 1373.

The Executive Order aims to prevent certain jurisdictions from receiving federal funds if they fail to comply with 8 U.S.C. § 1373. In relevant part, Section 1373 provides:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

8 U.S.C. § 1373(a). Section 1373 makes no mention of federal funds, as either conditions of compliance or as consequences of violation.

**B. The Cities' Policies**

Both Seattle and Portland ("Plaintiffs" or "Cities") pride themselves on their status as welcoming and internationally minded cities. Dkt. # 27 (FAC) at ¶¶ 21, 22, 36. To this end, Seattle enacted Ordinance 121063, "which provides that . . . unless otherwise required by law or by court order, 'no Seattle City officer or employee shall inquire into the immigration status of any person, or engage in activities designed to ascertain the

ORDER – 2

immigration status of any person.'" *Id.* at ¶ 25 (quoting Seattle Mun. Code § 4.18.015(A)). In addition, the Seattle Police Department Manual explains that "[b]eing an undocumented person in this country, barring any criminal activity, is a federal civil violation not enforced by the Seattle Police Department." *Id.* at ¶ 31 (citing Seattle Police Dep't Manual § 6.020). The Seattle Police Department will not enforce federal laws relating to illegal entry and residence, leaving such enforcement responsibility to Immigration and Customs Enforcement (ICE). *Id.*

Portland enacted similar ordinances. For example, ORS 181A.820 "prohibits state and local law enforcement from using moneys, equipment, or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws." *Id.* at ¶ 37 (quotations omitted). Portland also adopted City Resolution 37277, which states that "the City will continue to, in a manner consistent with state and federal law, prohibit the use of City funds, personnel or equipment to enforce federal immigration law." *Id.* at ¶ 41 (quotations omitted). Portland's Police Department "will not assist ICE unless a crime is committed or in case of an emergency." *Id.* at ¶ 40.

### C. The Cities' Federal Funding

Both Seattle and Portland rely heavily on federal funds for their operating budgets. For fiscal year 2017, Seattle has an operating budget of $5.71 billion, of which $55 million is derived from federal funds. *Id.* at ¶ 61. In addition, "[t]he federal government is contributing over $99 million in [multi-year capital funds] to Seattle in 2017." *Id.* "Between both capital and operating funds, [Seattle] will receive over $155 million from the federal government in 2017." *Id.* Much of the federal funding is provided to Seattle on a reimbursable basis for essential programs. *Id.* at ¶ 62.

For the 2016-17 fiscal year, Portland had an operating budget of $4.1 billion. *Id.* at ¶ 83. Portland expects to receive nearly $49 million in federal funds. *Id.* Similar to Seattle, much of Portland's funding is provided on a reimbursable basis. *Id.* at ¶ 84.

ORDER – 3

Many of those funds are used for essential programs. *Id.* at ¶ 85.

### D. Public Statements by the Government

On May 31, 2016, the Inspector General of the Department of Justice (DOJ) issued a memorandum in which he found that "policies prohibiting local officials from sharing information with the federal government are 'inconsistent with plain language of Section 1373.'" *Id.* at ¶ 98 (citations omitted). The Inspector General further found that cities may violate Section 1373 even if such policies do not exist but where "'actions of local officials result in prohibitions or restrictions' on information-sharing." *Id.* at ¶ 99 (citations omitted). However, he confirmed that Section 1373 did not require cities to disclose immigration status information or cooperate in any other way with ICE. *Id.* at ¶¶ 98, 101, 103.

The President, both during his campaign and since his election, has made comments evidencing his desire to deny funding to sanctuary cities. *Id.* at ¶ 129 (saying he "would withhold federal funds to punish so-called sanctuary cities."). The President specifically referred to Seattle as a sanctuary city, and said that "sanctuary cities are out . . . sanctuary cities are over." *Id.* at ¶¶ 131, 132. The President has been clear that his interpretation of ending sanctuary cities means defunding those cities. *Id.* at ¶ 135.

The President's press secretary "insisted that 'the President is going to do everything he can within the scope of the executive order to make sure that cities who don't comply with it—counties and other institutions that remain sanctuary cities don't get federal government funding in compliance with the executive order.'" *Id.* at ¶ 138 (citations omitted). The press secretary further stated that the Government would "strip federal grant money from sanctuary states and cities that harbor illegal immigrants." *Id.*

The Attorney General urged Congress to pass legislation that would "cut off relevant federal monies to sanctuary cities." *Id.* at ¶ 139. During a White House Press Briefing, the Attorney General clarified that "jurisdictions seeking or applying for Department of Justice grants [need to] certify compliance with 1373 as a condition of

ORDER – 4

receiving those awards." *Id.* at ¶ 140.

For several years, the Government has recorded jurisdictions "that fail to comply with federal requests for assistance in enforcing the immigration laws." *Id.* at ¶ 142. Seattle often appears in these records "as a jurisdiction with a 'sanctuary policy.'" *Id.* (citations and alternation omitted). Similarly, counties in Oregon, including ones associated with Portland, have been defined as "jurisdictions that refuse cooperation with federal immigration authorities[.]" *Id.* at ¶¶ 144, 145.

**E. Current Lawsuits**

In early 2017, the City and County of San Francisco and the County of Santa Clara filed suit against the Government in response to the Executive Order. *City and Cty. of San Francisco v. Trump, et al.*, No. 3:17-cv-00485-WHO (N.D. Cal. filed Jan. 31, 2017); *Cty. of Santa Clara v. Trump, et al.*, No. 3:17-cv-00574-WHO (N.D. Cal. filed Feb. 3, 2017). The parties sought injunctive and declaratory relief, and the Northern District of California granted relief by entering a nation-wide injunction that barred the Government from enforcing the Executive Order. *Cty. of Santa Clara v. Trump*, No. 17-CV-00485-WHO, 2017 WL 1459081, at *29 (N.D. Cal. Apr. 25, 2017), *reconsideration denied*, No. 17-CV-00485-WHO, 2017 WL 3086064 (N.D. Cal. July 20, 2017) ("*Santa Clara I*"). In issuing the injunction, the court rejected the Government's proffered arguments that "the Executive Order is a mere directive to the Department of Homeland Security ("DHS") and DOJ that does not seek to place any new conditions on federal funds." *Cty. of Santa Clara v. Trump*, No. 17-CV-00485-WHO, 2017 WL 3086064, at *1 (N.D. Cal. July 20, 2017) ("*Santa Clara II*").

In response to the injunction, the Attorney General drafted a memorandum attempting to narrowly interpret the Executive Order. Dkt. # 34-1. The memorandum repeated the unsuccessful arguments made by the Government during the hearing, but phrased them as "DOJ's 'conclusive' interpretation of the Executive Order." *Santa Clara II*, 2017 WL 3086064 at *2. With the memorandum in hand, the Government sought

ORDER – 5

reconsideration of the Court's order enjoining enforcement. The Northern District of California did not find the memorandum to constitute a legal opinion, nor did it find the memorandum binding on the agencies, and therefore denied the motion. *Santa Clara II*, 2017 WL 3086064 at *4-9 (finding, *inter alia*, that "[i]t is unnecessary to address the merits of the interpretation outlined in the AG Memorandum because it is the same interpretation the government proposed at oral argument; I have already assessed and rejected it as not legally plausible.").

On March 29, 2017, the City of Seattle filed a Complaint for Declaratory Relief seeking a judgment from this Court that Seattle complies with 8 U.S.C. § 1373 and that the Executive Order is unconstitutional under the Tenth Amendment and the Spending Clause. On June 26, 2017, the Complaint was amended to include the City of Portland as a plaintiff. This lawsuit is nearly identical to the one progressing in the Northern District of California. At issue before the Court is the Government's motion to dismiss Plaintiffs' Amended Complaint.

## II. LEGAL STANDARD

### A. FRCP 12(b)(1)

Federal courts are tribunals of limited jurisdiction and may only hear cases authorized by the Constitution or a statutory grant. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). The burden of establishing subject-matter jurisdiction rests upon the party seeking to invoke federal jurisdiction. *Id*. Once it is determined that a federal court lacks subject-matter jurisdiction, the court has no choice but to dismiss the suit. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

A party may bring a factual challenge to subject-matter jurisdiction, and in such cases the court may consider materials beyond the complaint. *PW Arms, Inc. v. United States*, 186 F. Supp. 3d 1137, 1142 (W.D. Wash. 2016) (citing *Savage v. Glendale Union*

ORDER – 6

*High Sch.*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003); *see also McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) ("Moreover, when considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction.").

### B. FRCP 12(b)(6)

Fed. R. Civ. P. 12(b)(6) permits a court to dismiss a complaint for failure to state a claim. The rule requires the court to assume the truth of the complaint's factual allegations and credit all reasonable inferences arising from those allegations. *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). A court "need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The plaintiff must point to factual allegations that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007). If the plaintiff succeeds, the complaint avoids dismissal if there is "any set of facts consistent with the allegations in the complaint" that would entitle the plaintiff to relief. *Id.* at 563; *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A court typically cannot consider evidence beyond the four corners of the complaint, although it may rely on a document to which the complaint refers if the document is central to the party's claims and its authenticity is not in question. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). A court may also consider evidence subject to judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

### III. DISCUSSION

### A. The Attorney General Memorandum ("AG Memo")

As a preliminary matter, the Government relies heavily on the AG Memo to support its arguments, claiming the memo "sets forth in a formal, conclusive manner the administration's interpretation of the scope of the grant-eligibility provision of Section

ORDER – 7

9(a)." Dkt. # 34 at 13. Plaintiffs disagree that the AG Memo carries the force of law. Dkt. # 38 at 13.

The Government asserts that "[b]y longstanding tradition and practices, the Attorney General's legal opinions are treated as authoritative by the heads of executive agencies." Dkt. # 34 at 13. But it is not apparent that the AG Memo is, itself, a legal opinion. Titled "Implementation of Executive Order 13768 . . .", Dkt. # 34-1, the AG Memo sets forth its internal plans for enforcing the Executive Order. The AG Memo is directed only to grant-making components within the DOJ and is rife with language of enforcement, not language of interpretation. For example, Defendant Sessions writes that "section 9(a) of the Executive Order . . . *will be applied* solely to federal grants administered by the Department of Justice or the Department of Homeland Security[.]" *Id.* at 1 (emphasis added). Defendant Sessions also writes that "the term 'sanctuary jurisdiction' *will refer only to* jurisdictions that 'willfully refuse to comply with 8 U.S.C. 1373.'" *Id.* at 3 (emphasis added). In the brief, two-page memo, Defendant Sessions does not offer any legal interpretations or determinations that indicate the scope or constitutionality of the Executive Order. He merely sets forth boundaries—arrived at in response to pending litigation—by which he intends to enforce the Executive Order. The AG Memo fails to meet traditional notions of what one would expect to constitute a legal analysis.

The Government cites *Tenaska Washington Partners II, L.P. v. United States*, 34 Fed. Cl. 434, 439 (1995), for the proposition that the Court should treat the AG Memo as an authoritative legal opinion. Dkt. # 34 at 13. But in *Tenaska*, the court made reference to an Office of Legal Counsel (OLC) memorandum that was extensively researched, and included input from several divisions, offices, and high-ranking officials within the DOJ. *Tenaska*, 34 Fed. Cl. at 439. The OLC memo thoroughly analyzed the relevant legal issues and offered a reasoned opinion as to the constitutional concerns present in that case. *Id.* The Government's use of *Tenaska* in this case is inapposite, where here the

ORDER – 8

two-page AG Memo offers little in the way of legal analysis or determination as to the constitutionality or scope of the Executive Order.

The Government's cites to 28 U.S.C. § 512 and 28 C.F.R. § 0.5 are similarly unavailing. As to the former, there is no evidence that "[t]he head of an executive department" requested "the opinion of the Attorney General" on any question of law. *See* 28 U.S.C. § 512. "And while section 0.5(c) requires the Attorney General to provide 'formal and informal' advice and opinions 'on legal matters,' 28 C.F.R. § 0.5(c), it is silent on whether any such advice would bind other agencies." *Santa Clara II*, 2017 WL 3086064 at \*7. Therefore, the Court finds that the AG Memo is not a legal opinion and therefore need not treat it as authoritative or binding on either the DOJ or the Department of Homeland Security.

**B. Ripeness**

The Government first challenges Plaintiffs' claims on ripeness grounds. Dkt. # 34 at 16. The Government claims that Plaintiffs' claims rest on contingent future events, especially in light of the fact that no action has been taken against them. *Id.* Plaintiffs argue that they have made the requisite showing that their case is ripe. Dkt. # 38 at 21-33.

The Ninth Circuit recognizes a constitutional and prudential component when analyzing claims for ripeness. *Thomas v. Anchorage Equal Rights Com'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). The "constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong." *Id.* In *Thomas*, the court analyzed the constitutional component of standing by looking to "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Id.* at 1139. Plaintiffs' Amended Complaint satisfies each of these elements.

ORDER – 9

First, Plaintiffs articulated several ordinances[1] that the Government may consider to be violations of Section 1373. Dkt. # 27 (FAC) at ¶¶ 23-30, 37-41. Considering the broad strokes of the Executive Order, made broader by the AG Memo[2], these ordinances will likely be read by the Government as "ways that state and local jurisdictions are undermining our lawful system of immigration . . . ." Dkt. # 34-1 at 3.

Second, Plaintiffs list many direct threats that the Government has made to enforce the Executive Order against Seattle and Portland. Dkt. # 27 (FAC) at ¶¶ 128-146. Specifically, the current administration has made a concerted effort to publicize the cities that it deems to be "sanctuary cities" as well as to make clear remarks as to its intent to defund these cities. *See, e.g.*, *id.* at ¶ 138 (quoting the President's press secretary as saying that the Government will "strip federal grant money from the sanctuary states and cities . . . .").[3]

Finally, Plaintiffs allege that the Government has already begun to implement the Executive Order. Specifically, Plaintiffs allege that the Government "slash[ed] $210 million in federal reimbursements to state and local jails that hold immigrants convicted

---

[1] For example, as articulated in their Amended Complaint, Seattle enacted Ordinance 121063 and Portland enacted ORS 184A.820.

[2] For example, the AG Memo states that the "Executive Order's definition of 'sanctuary jurisdiction' is narrow" but finds that "nothing in the Executive Order limits the Department's ability to point out ways that state and local jurisdictions are undermining our lawful system of immigration or to take enforcement action where state or local practices violate federal laws, regulations, or grant conditions." Dkt. # 34-1 at 3.

[3] *See also id.* at ¶¶ 129 (during his campaign, Donald Trump "said he . . . would withhold federal funds to punish so-called sanctuary cities . . . ."), 130 (also during his campaign, Donald Trump "declared that he would 'block funding for sanctuary cities' . . . and ensure that '[c]ities that refuse to cooperate with federal authorities will not receive taxpayer dollars.'"), 131 (stating that President Trump "referred to Seattle in particular as a 'sanctuary city' that would be a target of his administration."), 132 (responding to a Seattle interviewer's question, President Trump stated "that 'sanctuary cities are out . . . sanctuary cities are over.' He added that '[t]he federal government is going to have to get involved and they're going to have to get involved very sharply.'"), 134 ("In a speech to congressional Republicans, Defendant Trump declared: 'And finally, at long last, cracking down on Sanctuary Cities.'"), 135 (President Trump stated "that he is 'very much opposed to sanctuary cities,' and that '[i]f we have to, we'll defund.'"), 136 (President Trump "explained that he had 'ordered a crackdown on sanctuary cities.'"), 139 (Attorney General Sessions "called on Congress 'to make its first item of business the immediate passage of legislation to cut off relevant federal monies to sanctuary cities.'"), 140 (Attorney General Sessions "threatened that '[t]he Department of Justice will also take all lawful steps to claw back any funds awarded to a jurisdiction that willfully violates 1373.'").

ORDER – 10

of crimes while in the country illegally." *Id.* at ¶ 141. "And a federal judge recently stated that he had been warned by federal agents 'to expect a crackdown on immigrants in response to a new 'sanctuary' policy adopted by Travis County,' Texas." *Id.* Having met the core criteria, the Court is satisfied that Plaintiffs' claims are ripe under the constitutional component of the analysis.

The prudential component of the ripeness inquiry asks courts to consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). "A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Standard Alaska Prod. Co. v. Schaible*, 874 F.2d 624, 627 (9th Cir. 1989). The Government asserts that Plaintiffs' claims are not fit for judicial decision because those claims are based on "several 'contingent events that may not occur as anticipated.'" Dkt. # 34 at 19 (citations omitted). But the clear statements on record obviate the Government's arguments in this respect. Though the Government has not yet cut Plaintiffs' federal funding, its public comments and failure to legally cabin the Executive Order is enough to paralyze Plaintiffs and prevent them from completing their budget processes. Statements by the President and his Attorney General have not been equivocal regarding the efforts they have expressed against sanctuary cities. The unbridled statements of the Government far exceed what can be characterized as the mere jostling of words. The Government's words present a clear and present indication of what is in store for government funding for the cities of Seattle and Portland for failure to comply with the Attorney General's interpretation of Section 1373.[4]

This dovetails with the "hardship" element of prudential standing, which requires a plaintiff to "show that withholding review would result in 'direct and immediate' hardship and would entail more than possible financial loss." *Winter v. California Med.*

---

[4] The Executive Order is clear that the Attorney General "shall"—a nondiscretionary term— ensure that sanctuary cities are not eligible for federal funds. EO § 9(a).

ORDER – 11

*Review, Inc.*, 900 F.2d 1322, 1325 (9th Cir. 1989) (citations omitted). Plaintiffs met their burden by showing that sizeable reductions in federal funding to the tune of a combined $204 million would result from the Government's enforcement of the Executive Order. *See, e.g.*, Dkt. # 27 (FAC) at ¶¶ 61, 83. At this juncture, Plaintiffs would be forced to operate under a cloud of confusion. *Santa Clara I*, 2017 WL 1459081 at *21 ("Without clarity the Counties do not know whether they should start slashing essential programs or continue to spend millions of dollars and risk a financial crisis in the near future."). Plaintiffs need not wait for the Government to cut federal funding before bringing this case. Accordingly, the Court finds that this matter is ripe for judicial determination.

### C. Standing

The Government challenges Plaintiffs' standing to bring their claims because "the Cities' alleged injuries are too speculative to meet the constitutional standing requirement." Dkt. # 34 at 21. Our standing doctrine is familiar: Plaintiffs must show that they have suffered an "injury in fact" that is "fairly traceable to the challenged action of the defendant," and that "will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations, citations, and alterations omitted).

The Government argues that Plaintiffs' injuries are too speculative to constitute any kind of "injury in fact." Dkt. # 34 at 22. However, as already analyzed under the ripeness doctrine, Plaintiffs allege sufficient facts to show that the Government has been unequivocal in its expressed intention to enforce the Executive Order. Consequently, Plaintiffs have a "well-founded fear of enforcement" and therefore a well-founded fear of losing many vital federally funded programs. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). At this stage, this is enough to establish standing.

### D. Declaratory Judgment

Plaintiffs' first cause of action asks the Court for a determination that Seattle and Portland comply with 8 U.S.C. § 1373. Dkt. # 27 (FAC) at ¶ 177-181. The Government

ORDER – 12

argues that Plaintiffs fail to identify a cause of action that authorizes such relief, and even if Plaintiffs did identify an appropriate cause of action, the Government argues that granting such relief amounts to an advisory opinion. Dkt. # 34 at 22.

The Declaratory Judgment Act, 28 U.S.C. § 2201, is available when there "is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-42 (1937)); *see also* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."). The Declaratory Judgment Act "is intended to allow earlier access to federal courts in order to spare potential defendants from the threat of impending litigation." *Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401, 1405 (9th Cir. 1996).

Plaintiffs' Amended Complaint evidences a substantial controversy that is real and immediate between the Cities and the Government. Specifically, Plaintiffs list certain ordinances that the Government is likely to find violate Section 1373, as espoused in its public statements in connection with the Executive Order that broadly interpret Section 1373. Plaintiffs need not wait for the Government to affirmatively name them as "sanctuary cities," embark on litigation seeking to invalidate Plaintiffs' ordinances, or cut Plaintiffs' federal funding. Instead, Plaintiffs may "seek declaratory relief to resolve this 'real and substantial' legal dispute." *Santa Clara II*, 2017 WL 3086064 at * 12; *see also Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 943 (9th Cir. 1981) ("The Act permits parties so situated to forestall the accrual of potential damages by suing for a declaratory judgment, once the adverse positions have crystallized and the conflict of interests is real and immediate.") (citing *Japan Gas Lighter Assoc. v. Ronson Corp.*, 257 F.Supp. 219, 237 (D.N.J. 1966)).

ORDER – 13

### E. Tenth Amendment

Plaintiffs claim that the Executive Order violates the Tenth Amendment's anti-commandeering rule. Dkt. # 27 (FAC) at ¶¶ 182-183. The Government argues that this claim "rests on a misreading of the Executive Order," or, alternatively, that Plaintiffs fail to establish "that no set of circumstances exists under which the Order would be valid." Dkt. # 34 at 24 (quotations, citations, and alterations omitted).

The Tenth Amendment to the United States Constitution reserves to the States any "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X. In doing so, the Tenth Amendment prohibits the Federal Government from compelling "the States to enact or administer a federal regulatory program." *New York v. United States*, 505 U.S. 144, 188 (1992). "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). The anti-commandeering principle prohibits both direct and indirect coercion by the Government on the States. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012).

Plaintiffs' Amended Complaint alleges facts sufficient for this Court to find that the Government is likely to consider both Seattle and Portland to be "sanctuary cites." Dkt. # 27 (FAC) at ¶¶ 131, 145. As such, the Executive Order places the Cities at risk of losing all of their federal funding. *See* EO § 9(a). Because these federal funds are necessary for the functioning of the Cities, Plaintiffs "may have no legitimate choice regarding whether to accept the government's condition in exchange for those funds." *Santa Clara I*, 2017 WL 1459081 at *24. The Executive Order's conditioning of federal funds on the Cities' enforcement of federal regulations falls directly within the ambit of the Tenth Amendment. This kind of coercion is unconstitutional. *New York*, 505 U.S. at 187 ("But the Constitution protects us from our own best intentions: It divides power

ORDER – 14

among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.").

The Government argues that it will interpret the Executive Order in a constitutional manner, and therefore Plaintiffs have not sufficiently argued that "no set of circumstances exist under which the Order would be valid." Dkt. # 34. But Plaintiffs have alleged that the Government is already interpreting the Executive Order in an unconstitutional manner. Moreover, the Government's "gotcha" argument that Plaintiffs could "simply decline to participate in the grant program" fails to take into account the overwhelming necessity of federal funds for the Cities' basic welfare.

**F. Spending Clause**

Plaintiffs allege the Executive Order violates the Spending Clause. Dkt. # 27 (FAC) at ¶¶ 184-187. Specifically, Plaintiffs aver that the Executive Order is unconstitutionally coercive, places unrelated conditions on federal funds, and fails to provide "adequately unambiguous notice to municipalities of the conditions that the federal Executive Branch now would attach to the receipt of federal funds." *Id.* The Government argues that the Executive Order cannot violate the Spending Clause as it directs the Executive Branch to exercise its existing power. Dkt. # 34 at 28. The Government further argues that conditions attach only to those federal funds issued by the Departments of Justice and Homeland Security—not to all federal funds—and therefore there is nothing overly coercive or ambiguous about the Executive Order. *Id.* at 28-29.

The Spending Clause authorizes Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal

ORDER – 15

moneys upon compliance by the recipient with federal statutory and administrative directives.'" *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)). Congress's power to attach conditions is limited in four respects: (1) "exercise of the spending power must be in pursuit of 'the general welfare'"; (2) conditions must be unambiguous, "enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation"; (3) conditions must be related "to the federal interest in particular national projects or programs; and (4) conditions must be consistent with other provisions of the Constitution. *Id.* at 207-208 (citations omitted).

The Government avers that the AG Memo invalidates Plaintiffs' Spending Clause claim because the memo clarifies that, "[a]s a threshold matter, . . . the Executive Order does not impose conditions on federal grant programming." Dkt. # 34 at 28. The Court already found, above, that the AG Memo is not binding authority. Though, if it were, by the Government's reasoning, it would effectively castrate the Executive Order: if the Executive Order were merely telling the Executive Branch to "follow existing law," then the document would be rendered meaningless. Accordingly, taking the Executive Order at its word, it conditions funding on jurisdictions' compliance with Section 1373[5], as interpreted by the Attorney General or Secretary. EO § 9(a).

Without the AG Memo, the Government's remaining arguments fall flat. The Executive Order is ambiguous as Plaintiffs are unsure if they will be considered: (1) to be "sanctuary jurisdictions"; or (2) in compliance with or in violation of Section 1373 considering the broad, public statements made by Government officials. Furthermore, the Executive Order does not relate the conditions on federal funds specifically to Section 1373, or even generally to immigration, but rather requires certain, ambiguous conditions

---

[5] This is a generous reading of the Executive Order, which enables the Attorney General to "take appropriate enforcement action against any entity that violates 8 U.S.C. § 1373, **or** which has in effect a statute, policy, or practice that prevents or hinder the enforcement of **Federal law**." EO § 9(a) (emphasis added).

ORDER – 16

in order to receive *any* federal funding. EO § 9(a). The Executive Order fails to provide an adequate nexus between its immigration-related enforcement conditions and grants of funds, especially in light of evidence that Plaintiffs require federal funding for various essentials unrelated to immigration, including infrastructure, healthcare, and affordable housing. *See, e.g.*, Dkt. # 27 (FAC) at ¶¶ 60-96.

The Executive Order's conditions are inconsistent with the Tenth Amendment. As stated above, the conditions are unconstitutionally coercive; the Cities do not have meaningful alternatives to accepting federal grants. *Dole*, 483 U.S. at 211 ("Our decisions have recognized that in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'") (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). Accordingly, Plaintiffs successfully pled their Spending Clause claim.

### G. Separation of Powers

Plaintiffs allege that the Executive Branch has usurped Congress's exclusive power under the Spending Clause. Dkt. # 27 (FAC) at ¶ 189. Indeed, the Constitution provides that "*Congress* shall have Power To lay and collect Taxes, Duties, Imposts and Excises[.]" U.S. Const. art. I, § 8, cl. 1 (emphasis added); *see also Dole*, 483 U.S. at 206. Under its constitutional authority, Congress enacted 8 U.S.C. § 1373. Congress did not require states or cities to comply with Section 1373 as a condition to receive federal funding.

Once Section 1373 became law, the Executive Branch was required to "take Care that the Law be faithfully executed." U.S. Cost. Art. II, § 3, cl. 5; *see also Santa Clara I*, 2017 WL 1459081 at *21. Congress did not delegate to the President—whether expressly, impliedly, or through acquiescence—any power or authority to condition funding on compliance with Section 1373. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."). Therefore, the President

ORDER – 17

did not have the authority to create new conditions on federal funding, or to withhold funding based on his own interpretation of Section 1373. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637(1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . ."); *see also Santa Clara I*, 2017 WL 1459081 at *22 (citing *City of New York*, 524 U.S. at 439). The Executive Order's "attempt to place new conditions on federal funds is an improper attempt to wield Congress's exclusive spending power and is a violation of the Constitution's separation of powers principles." *Santa Clara I*, 2017 WL 1459081 at *22.

### H. Whether the Court Should Stay this Matter

The Government is defending a nearly identical lawsuit to this one in the Northern District of California. *See County of Santa Clara v. Trump, et al.*, No. 3:17-cv-00574-WHO (N.D. Cal.). Much of the briefing and strategy in this matter appear to mirror that of *Santa Clara*. The Court requests briefing from the parties regarding whether a stay in this matter pending the outcome in *Santa Clara* is appropriate. If the parties agree on a response, they may submit a joint brief not to exceed five (5) pages. If there is no agreement, each party may submit their own responsive brief not to exceed five (5) pages. Parties must submit these briefs within ten (10) days from the date of this Order.

### IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** the Government's Motion to Dismiss. Dkt. # 34. **As outlined above, the Court requests briefing from the parties regarding a potential stay in this matter**.

DATED this 19th day of October, 2017.

*Richard A. Jones*
The Honorable Richard A. Jones
United States District Judge

ORDER – 18